**In re BMW GROUP I, LTD., Debtor.**

**Bankruptcy No. BK–93–12576–BH.**

United States Bankruptcy Court,
W.D. Oklahoma.

May 27, 1994.

---

Kwame T. Mumina, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C. and James F. Davis, Andrews, Davis, Legg, Bixler, Milsten & Price, Oklahoma City, OK, for debtor.

Kiran A. Phansalkar, Hastie & Kirschner, Oklahoma City, OK, for Southwest Portfolio Partnership.

## MEMORANDUM OF DECISION AND ORDER DENYING CONFIRMATION OF PROPOSED PLAN OF REORGANIZATION

RICHARD L. BOHANON, Bankruptcy Judge.

The issue for decision is whether the partners of the debtor-in-possession may purchase the equity in a proposed reorganized debtor when a class of unsecured claims has rejected the plan, opposes confirmation and is not receiving payment equal to the full amount of its claim? [1] In other words, has the debtor-in-possession proven that its proposed plan is fair and equitable? On the facts of this case I can only conclude that it has not.

BMW Group I, Ltd., the debtor-in-possession, is a general partnership that developed and owns a major shopping center in Oklahoma City which is its sole asset. The center is well occupied and generating substantial rental income but BMW filed its chapter 11 petition to attempt reorganization on the threat of foreclosure.

Southwest Portfolio Partnership holds about 99% of the claims against the estate and has a first mortgage lien on the shopping center. Its debt is approximately $14,000,-000 and the parties agree that the shopping center is worth about $9,000,000.

BMW's financial problems began with the failure of First Savings and Loan Association of Fort Stockton, Texas. In 1983 it lent BMW the funds to build the shopping center. This was a typical short-term "construction" note secured by the first mortgage. The association also committed to make a long-term "permanent" loan when the center was completed. When the construction loan came due, however, the association had failed and the Resolution Trust Corporation was its receiver. The RTC refused to honor the permanent loan commitment and demanded immediate payment of the full amount due. The debtor was unable to pay and default followed.

---

1. Some would state the issue to be whether or not the plan satisfies the "new value exception to the absolute priority rule." For reasons which will appear I eschew that label, believing it to be misleading. Further, when the label is removed it is unnecessary to determine whether the concept to which it was affixed has survived enactment of the Bankruptcy Code.

In 1992 the RTC sold this note to Southwest in a "pool" with other securities, for a total of approximately $60,000,000.[2] The default continued and Southwest commenced judicial foreclosure in early 1993. The voluntary petition soon followed.

■ The proposed plan classifies Southwest's $9,000,000 secured claim, and proposes to pay it in full with modifications. The trade creditors with claims of about $40,000 are placed in a class and are to be paid in full in three monthly installments. Southwest's unsecured deficiency claim, which exceeds $4,000,000, is placed in a separate class. This form of classification under 11 U.S.C. § 1122(a) has been previously approved in this Court. See In re ZRM–Oklahoma Partnership, 156 B.R. 67 (Bankr.W.D.Okl.1993). It is the treatment proposed for this class, however, that creates the problem for, as I said in ZRM, separate classification does not eliminate the other forms of creditor protection contained in the Code.

The plan does not propose to pay the allowed amount of Southwest's separately classified unsecured claim as of the effective date for it does not allow for interest.[3] BMW, therefore, cannot obtain an order confirming the plan if it results in the partners receiving or retaining any property on account of their equity interest. 11 U.S.C. § 1129(b)(2)(B).

With this requirement in mind the plan proposes to cancel the general partners' equity interest. It then creates a new entity which would receive legal title to the shopping center. This entity would be capitalized with land and money having a value of approximately $500,000.[4] The partners of the old debtor would have the exclusive right to acquire the equity ownership of the new enti-ty. It then would own the shopping center subject only to the modified note secured by the first mortgage, the obligation to pay the $40,000 trade class claims in full, and the commitment to make some indefinite payments on Southwest's unsecured claim. The old partners electing to participate in the new entity would then control the going concern asset and receive any future profits and any potential increase in value.[5] The owners of the new entity would have no personal liability to Southwest on account of the obligations created under the plan and, hence, would have nothing to lose other than their investment. In the event there is no default and foreclosure of its mortgage Southwest would not share in any increase in value of the shopping center.

The issue, thus, is whether or not this proposed treatment is "fair and equitable" as that term is defined and used in section 1129(b) of the Code.

The subject of statutory interpretation arises in virtually every bankruptcy case and proceeding and has been the topic of considerable attention in this court in recent months. See In re Horwitz, 167 B.R. 237 (Bankr.W.D.Okl.1994). In that decision a distinction was drawn between statutes that are absolute in their meaning and those which are discreet, being those where the judge must exercise discretion. Section 1129(b) contains provisions that are both absolute and discreet. On the one hand the treatment of the class must be "fair and equitable" but that term also contains an absolute command requiring that the "holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). Put in the context of the

2. The specific amount Southwest paid the RTC for the $14,000,000 note became an issue at the hearing for BMW contended the answer was relevant to a determination of whether the plan's treatment of it is "fair and equitable." It is unnecessary, however, to reach this issue in order to decide the matter for others control the outcome.

3. The plan does propose payments to this class under a complex formula based on a percent of the reorganized debtor's net profits, if any. The class members, however, would never receive

property having a value equal to the allowed amount of their claims as of the effective date. See 11 U.S.C. § 1129(b)(2)(B)(i).

4. This amount is an approximation for about one-half of it is in the form a contribution of land whose value is disputed.

5. Southwest obviously did not make the election offered by 11 U.S.C. § 1111(b) and did not propose its own plan.

case at hand it means that debtor's partners, old equity, cannot receive or retain anything on account of their interest in the debtor. If they do the statute is absolute in its terms and the plan cannot be confirmed. Coincidentally, this requirement has been termed the "absolute priority" rule. The query then turns to an examination of whether or not the partners receive or retain anything on account of their equity interest and, if so, whether or not it has any value. The first is obvious for they receive the exclusive right to buy 100% of the equity interest of the new debtor. If this right has any value at all the plan cannot be confirmed.

There is little jurisprudence dealing with the plain language of section 1129(b)(2)(B) for most of the cases deal with the issue in terms of the "new value exception to the absolute priority rule" and a gloss has grown up around that phrase. In *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) the Court reviews the history of old equity participation in reorganized debtors and concludes that the debtor's retention of equity in exchange for future labor was not consideration that could be deemed fair and equitable based on prior decisions. In *Unruh v. Rushville State Bank,* 987 F.2d 1506 (10th Cir.1993) the Court of Appeals followed in saying that promises of labor, fuel and repairs to be contributed in return for equity in the reorganized debtor were inadequate. *In re Bonner Mall Partnership,* 2 F.3d 899 (9th Cir. 1993), cert. granted —— U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994) discusses the concept and indicates that under proper circumstances old equity may acquire a reorganized debtor. In *In re Outlook/Century Ltd.,* 127 B.R. 650 (Bankr.N.D.Cal.1991) the Court concluded that the "new value exception" no longer exists. *Outlook* does, however, discuss a similar fact situation and points out that (1) the proposed plan does not operate in an open market, (2) other potential investors are not allowed to make offers for the reorganized debtor, (3) the price for new equity is fixed by the plan, and (4) there is no mechanism to attract or consider higher bids. It then says "[t]his exclusive right of Debtor's existing partners to obtain equity interests in Debtor itself constitutes property that

the partners retain 'on account of' their existing interests." *Outlook, supra* at 654. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351 (7th Cir. 1990) also reviews the issue and concludes that a plan based on an offer by old equity to acquire the reorganized entity in exchange for revocable loan guarantees could not be confirmed.

As is readily seen, many of the cases on the issue of old equity's acquisition of the reorganized debtor begin and end on the question of whether the price proposed to be paid is fair. For purposes of this case one may assume *arguendo* that the $500,000 is reasonably equivalent value under the "new value exception" gloss. The focus then becomes whether old equity has received any property on account of its junior interest and whether the plan is otherwise fair and equitable.

■ This leads directly to Professor Elizabeth Warren's comprehensive article *A Theory of Absolute Priority,* 1991, Annual Survey of American Law 9 (1991). Since her thinking ought to be part of the jurisprudence of this important subject, a copy of the article is appended to this memorandum. Upon reading it the conclusion becomes clear that there is no valid reason why old equity should be prohibited *per se* from purchasing the reorganized debtor's equity. It also is plain, however, that two factors need to be satisfied in the process; (1) old equity cannot retain or receive anything on account of its interest, and (2) the method by which it acquires equity in the new entity must be fair and equitable.

The concept is perhaps easier to understand if viewed from the perspective of a chapter 11 case with an independent trustee. There is no reason why the trustee could not sell equity in the new entity to the old equity holders and there might be all sorts of reasons why they would be willing to pay the best price, having knowledge of the business and the other factors Professor Warren discusses. A prudent trustee, however, would obviously test the market to determine how to obtain the most benefit for the estate. In this process she likely would offer the equity

to the creditors, other shopping center owners in the community, real estate brokers, and anyone else who might be perceived as willing to pay the highest and best price. Also, since her obligation is to maximize returns to the bankruptcy estate it would not be acceptable for the trustee to grant old equity, or anyone else, an exclusive option to purchase the interest without receiving some fair value in return.

By obtaining this exclusive option BMW's old equity is, therefore, receiving or retaining something with a noticeable value on account of its junior interest. Furthermore, the treatment as it affects the unsecured Southwest class is not fair and equitable for no one knows what the equity interest would bring on the open market, or what Southwest itself might be willing to pay for it.

For these reasons BMW's plan is not fair and equitable. It does not satisfy the absolute rule of priority for the equity class receives or retains some value on account of its interest. It also violates the discreet concepts of equity and fair play embodied in the term "fair and equitable" for I cannot determine from the record that the interest would not bring a higher price if it were offered on the open market.

I, therefore, am unable to conclude that BMW has satisfied the "fair and equitable" standard of 11 U.S.C. § 1129(b)(2)(B)(ii).

Accordingly, confirmation of the proposed plan is denied.

## APPENDIX

1991 Ann.Surv.Am.L. 9

**Proceedings and Papers of a Bankruptcy Law Symposium Held at the New York University School of Law April 12, 1991 Absolute Priority**

**A THEORY OF ABSOLUTE PRIORITY**

New York University School of Law

February, 1992

Elizabeth Warren [FNa1]

### INTRODUCTION

At the heart of corporate law is a fundamental ordering between the equity owners and the creditors: in the event of collapse, creditors will be paid in full before equity will receive any distribution from the company. That ordering is also a crucial part of the bankruptcy reorganization scheme, embedded in the so-called absolute priority rule which requires that superior classes (creditors) either be paid in full or consent to less than full payment before inferior classes (equity owners) receive any distribution on account of their ownership. [FN1] In a liquidation, the application of the absolute priority rule produces little controversy, but in a bankruptcy reorganization the issues become somewhat more complicated.

Creditors often complain that during a chapter 11 cramdown—confirmation of a plan of reorganization over the opposition of one or more classes of creditors—old equity emerges as the owner of the reorganized company in violation of the rule of absolute priority. Old equity counters that it is the owner of the post-reorganization business by virtue of a "new value exception" to the absolute priority rule which permits it to retain ownership because it has contributed new money to the reorganization effort. Scholars have debated the point, [FN2] and recent cases in the United States Supreme Court, the Seventh Circuit, and the Fifth Circuit have questioned whether the "new value exception" survives adoption of the 1978 Code. [FN3] At stake, according to most observers, is the opportunity for debtor survival and the cost imposed on the creditors of reorganization efforts as failing companies attempt to use bankruptcy to restructure their debts. Less often discussed, but perhaps more critically important, is that any rule of absolute priority will have a powerful impact on the bargaining leverage of debtors and creditors in working out consensual plans.

To analyze the problem of absolute priority, I make four claims. First, the control, ownership, and going-concern value of a reorganizing business are best understood as assets of the bankrupt estate, available for sale or, if not sold, for distribution to unpaid creditors. Second, reorganization procedures are best evaluated in terms of whether they bring the best price to the estate for the

assets sold, including the best price for the sale of control, ownership, and going-concern valuation. Third, to assure that the highest prices are brought for the sale of these assets of a reorganizing business, bankruptcy incentives should be structured to develop full information for all potential purchasers. And, finally, if creditors can prohibit old equity from participating in a purchase of a reorganizing business, old equity will lose practical advantages that it now enjoys in shaping a reorganization for its own benefit, but that constraint will come at the cost of a lower survival rate in bankruptcy with resulting losses for more creditors.

I also examine the formal rules of absolute priority. I conclude that the Bankruptcy Code does not prohibit old equity from participating in the purchase of a reorganizing business through the process of a plan cramdown. I also argue that current analysis through the lens of the "new value exception" often obscures the valuation issues at stake in the purchase of ownership and control. I conclude that the courts should treat a cramdown more like the sale of a reorganizing business, limiting the period of exclusivity and monitoring or replacing management to assure that old equity does not take advantage of its insider status.

I

A THEORY OF ABSOLUTE PRIORITY

Because the concept of absolute priority is central to the bankruptcy bargain, it is important to examine a number of features of the bankruptcy system to see how the concept should operate as part of the larger system. In this section, I focus on the structure of the bankruptcy system and how a rule of absolute priority contributes to that structure. I concentrate on how conceptual pieces should fit together, reserving for the following section a close reading of the specific case law and statutory provisions that comprise the rule. In this section, I also try to establish a theoretical analysis of the problem of absolute priority, and in the subsequent section I compare the theory to both

the formal requirements of the statute and the actual functioning of the rule.

*Plan Confirmation as an Asset Sale.*— When a debtor files for bankruptcy, an estate is created. [FN4] The estate holds all title to the property of the pre-bankruptcy debtor, both legal and equitable. In the case of a corporation, this estate owns not only the machines and real estate, outstanding contracts and customer lists, but also the control and ownership of the business and its going-concern value. [FN5]

Conceptually, confirmation of a chapter 11 plan is the sale of all assets of the recently-created bankruptcy estate to the newly-created, post-reorganization business. [FN6] Along with the sale of the hard assets and goodwill goes the sale of control and ownership and the going-concern value. Three legal entities are involved in a successful chapter 11 plan confirmation: the pre-bankruptcy debtor, the estate, and the post-bankruptcy business. The debtor gives way to the bankruptcy estate at the time of the initial filing, the estate gives way to the post-bankruptcy entity on confirmation of a plan, and the post-bankruptcy business survives the confirmation.

Management of the pre-bankruptcy business faces a similar metamorphosis in its employment relationship. Management runs the business until a bankruptcy filing, working as any management should to maximize the profits of the business. Upon filing, old management now runs the estate as the debtor-in-possession ("DIP"), overseeing both the business operations and the legal maneuvering to steer the business toward a plan confirmation. Once a plan is confirmed, the surviving business may employ any management, including the pre-bankruptcy/DIP management it has had throughout the process. During the course of a successful chapter 11 reorganization, management will have worked for all three legal entities, maximizing the value of each.

During the pendency of a bankruptcy, the DIP works on behalf of all the creditors to develop the most valuable company, using very different tools than those available to the pre-bankruptcy or post-bankruptcy management. The DIP reshapes the business

through assumption and rejection of contracts, setting aside voidable preferences, dropping unprofitable ventures and pursuing new business plans. The DIP offers, through the plan confirmation, to sell the business to the post-reorganization equity owners named in the plan. [FN7] The new owners may be old creditors who take equity as part of their debt repayment, they may be outsiders who purchase the business, or they may be old equity who purchase the new business. The price, also named in the plan, may be denominated as debt satisfaction, purchase, or contributions, but functionally it is a price for control, ownership, and going-concern value in the reshaped business.

The DIP owes a fiduciary obligation to the creditors to get the best possible price for estate assets. To do less not only violates the duty imposed on a DIP operating a business in chapter 11, but it also violates the principal reason for a reorganization—to enhance return to the creditors and to increase the opportunity for reorganization of the business.

A rule of absolute priority reinforces the scheme outlined here. A rule that prohibits old equity from retaining any interest in the post-bankruptcy business on account of its earlier interest in the pre-bankruptcy debtor simply restates the rules creating the estate: upon filing, the bankruptcy estate owns all interests, legal and equitable, of the pre-bankruptcy debtor. [FN8] No one retains any interest in property of the estate—not the secured creditors, not the unsecured creditors, and not the old owners of the estate. Creditors may file claims for payment and payout from the estate which will be determined according to detailed statutory provisions. [FN9] Old owners may come back to claim control only with the consent of the creditors [FN10] or if the creditors are paid in full. [FN11] No legal rights carry through from any relationships with the pre-bankruptcy debtor to relationships with the post-bankruptcy company. Everything stops for resolution in the bankruptcy estate. That estate, in turn, is run to maximize its own value, using both ordinary business practices and the extraordinary procedures

available in bankruptcy. The enhanced estate is sold in the plan confirmation, with compensation from the sale paying the creditors and, if the value is high enough, old equity owners.

*Selling the Assets.*—No theory is very useful unless it accounts for the imposition of reality. In constructing a theory of absolute priority, the concept of sale of control, ownership, and going-concern value is critical, but the reality of what is involved in that sale is quickly imposed on that picture.

In order to sell ownership and control, the DIP must name a price in the proposed plan. To do so, the DIP must value the business and persuade the court that its valuation is accurate. In practice, no problem in bankruptcy is more vexing than the problem of valuation. Volumes have been written on it, [FN12] literally thousands of cases each year involve disputes about it, and virtually every aspect of the bankruptcy system turns on it. [FN13] Nonetheless, there is little conceptual guidance for valuing most assets, beyond some general sense of liquidation values and going-concern values. Both parties and courts try to scrape together a coherent picture of the business with a variety of numbers and an overriding sense of skepticism about the accuracy of any valuation estimates.

When a plan of reorganization is proposed for confirmation, impaired creditors should have a right to question whether the price proposed for the sale of the business is adequate. Although the DIP is supposed to maximize value for the estate, the creditors have independent rights to question proposed valuations in the plan confirmation process. If they are forced to bear some loss on their outstanding debt under a proposed plan, the creditors have the right to monitor the DIP's proposed sale to make certain that they lose as little as possible.

The DIP faces its hardest valuation problem when it proposes to sell the ownership and control of the on-going concern as part of the plan confirmation. Accountants may offer a number of different ways to value the business, but there is usually a clear recognition that the valuation is highly speculative, based on projected strength of the business

following major disruption in its performance. Notwithstanding the difficulty of valuation, the DIP must propose a plan that includes the sale of control, ownership, and going-concern valuation of the business, usually denominated as an equity investment, in the confirmation plan.

Two factors contribute to the difficulty of reaching the best value for the reorganizing business: the thinness of the market for the business, and the possibility for self-dealing by the manager charged with selling the business. In the case of chapter 11 reorganizations, these factors may reinforce each other to further depress the price realized for the bankruptcy estate.

The DIP's difficulties in selling control are hampered by the thin market for purchasing equity in companies emerging from bankruptcy. Markets for control of all businesses are thin, [FN14] and the markets for failing businesses are even thinner. Although some market is developing, [FN15] businesses emerging from chapter 11 are widely identified as very high risk without sufficient potential gain to offset that risk and to attract new investment. Notwithstanding financial restructuring of the surviving business, new equity faces a very real possibility of complete wipeout. The ordinary business risks that brought the company to the edge of disaster earlier, may persist and the new burden undertaken in the reorganization plan may be more than the business can support. Such risk assessment is likely justified. Although estimates vary, most observers believe that fewer than one in five businesses filing for chapter 11 manages to survive intact. [FN16] Capital for businesses in bankruptcy is limited, and, to the extent it is available, the price will be high.

In the case of closely held companies, the market problems are even more acute. For all small businesses—even those with successful operations—attracting equity investment is often a problem. Insider control available to the equity owner/manager depresses the market for additional equity investment. [FN17] The market widely perceives that it is difficult to monitor the equity owner/manager to make certain that there is no diversion of assets to the manager (e.g., in the form of above-market salaries and perks for the manager or family members). The opportunity to divert assets increases the risk that reported profits will be depressed, causing outside equity investors to receive lower returns than inside equity investors. Because monitoring costs are high, even in the best of times, outside equity demands a premium to invest in small businesses. [FN18] These factors necessarily depress the anticipated bid price for ownership and control of a small business.

The market value of a small business is also depressed by the difficulty of retaining value in the business after the sale. The talents and energies of the current owner/manager may contribute significantly to the value of the business, but after a sale, the old manager may take those talents and energies elsewhere. An outside buyer anticipating that event faces a difficult valuation problem: what is the appropriate distribution of current value of the business attributable to the talents and energies of the owner/manager who will leave the business, and what value is intrinsic to the business and will survive a change in management? Any good management may add value to a business, but in the case of a small business, the value added by management may be more specialized and far more difficult to replace. [FN19] The uncertainty associated with this valuation difficulty, which is most acute in the case of a small business with an effective owner/manager, further limits the market for such businesses. Thus, an outside investor risks replacing current management with another manager who must be monitored as carefully as old management, but who may not add the same value of the business. [FN20]

The structure of a buyout bid in a reorganization may further depress the market. The participation of a DIP, who has superior information about the business, tends to drive out other bidders. To the extent the offered price of an outsider is below the value of the business, the DIP can always bid the next price and capture the bargain purchase; when the bid price exceeds the market price, the DIP can drop out and let an outsider

overpay. Because potential bidders know that they will compete against a better-informed bidder, they are less likely to bid or more hesitant to bid their full estimate of value.

A second factor that may affect whether the estate receives maximum benefit for the sale of the business is whether the seller—the DIP—acts in its own self-interest or in the interest of the estate. If the DIP proposes to participate in the post-reorganization business, the estate risks that the price obtained for the sale will not maximize its return, but will instead permit the DIP to capture value for itself.

The incentives pressing on a DIP who plans to become an owner of the post-reorganization businesses are clear: keep the ownership value of the business depressed, and buy it for a bargain price in the plan of reorganization. The specter of self-dealing is a powerful concern in any proposed management buyout. Professors Brudney and Chirlstein examine this concern in the corporate arena generally, arguing for a per se prohibition on management participation in a buyout. [FN21] In a bankruptcy reorganization, management self-dealing can rob an estate of value, depriving it of money to pay the outstanding debt.

The problems of self-dealing in reorganizations are most acute in the context of a small business. Outside scrutiny is likely to be minimal. Information about the company may be difficult to acquire, and creditors may not see the investment required to monitor effectively as justified by the likely return.

Empirical research confirms that in small business cases, the owner/operator tends to retain control through a consensual plan while discharging some debt. [FN22] By contrast, when a large, publicly-traded corporation with shareholders who exercise only tenuous control over management declares bankruptcy, the issues of absolute priority rarely involve the kind of valuation problems illustrated here. Old equity interests are limited, and rarely is the DIP planning to purchase estate assets. [FN23] Size does not guarantee insulation against self-dealing,

however. When, for example, a plan of reorganization of a large business involves a DIP/management buyout, the same factors are at work. [FN24]

The circumstances of the sale of control focus the issues in absolute priority cases quite neatly. In the case of the small business the market for control is likely to be thinnest and the possibility of DIP self-dealing is likely to be highest. The pressures may be cumulative or causal. With a thin market to compete for the purchase of control of a failing business, the DIP may be able to set the price alone. Even if there is competitive bidding for the business, the market may not function adequately. The lack of a robust market permits the DIP to claim, with a straight face, that a low bid is the market price, thus increasing its own chance of purchasing at a bargain—and adding a multiplier effect to the thin market/self-dealing duality. [FN25]

To be useful, a theory of absolute priority must account for a thin market and for the possibility of self-dealing. Since those difficulties typically arise in the small business case, that is the context in which they are discussed here—although it is done with the recognition that the application of the principles developed apply in any circumstance in which management proposes to participate in the post-reorganization business, which includes some large reorganizations as well.

*The Value of Control, Ownership and Going–Concern Value.*—As the factors combine to make a market for the closely-held business very weak, the DIP faces the possibility of purchasing assets of the estate—including control, ownership, and going-concern value—for less than a fair price. Although not usually articulated in such stark terms, this possibility lurks behind every confirmation of a chapter 11 plan in which the DIP plans some ownership participation in the post-reorganization company.

Some courts conclude that the solution to this problem is to bar old equity from participation in the post-reorganization business unless old debt has been paid in full. [FN26] The real difficulty is not old equity, as such, but the DIP who plans to become new equity. The overlapping identities between old

equity and the DIP, especially in small businesses, make this problem often one of academic, rather than real, distinctions, but the point is worth noting. It serves as a reminder that the focus on the absolute priority rule is somewhat misplaced, a point developed in detail later in this paper. But even as a rough approximation, the difficulty with barring old equity from any participation is that it only makes more difficult the original goal to maximize the return to the estate for the sale of the estate's assets.

When old equity bears a close relationship to the DIP, it has clear advantages in bidding for the control of the post-reorganization business. Notwithstanding these advantages, it is not clear that all bids for reorganizing businesses involve undervaluing the assets of the bankruptcy estate. There are benefits to the estate in this relationship as well.

The most obvious benefit to the estate is that some market is better than no market. [FN27] Because the market for equity participation in small businesses is already thin, and the market for failing small businesses is even thinner, old equity may be the best source for equity contributions necessary for the business' survival. If old equity is willing to purchase control, ownership, and going-concern value of the business, then the estate will receive some value for the asset rather than watch it dissipate.

The Bankruptcy Code gives vitality to the concept that some market is better than no market, by imposing constraints on the confirmation of a chapter 11 plan, such as the requirement that a chapter 11 sale capture benefits that would be lost in liquidation. Every creditor in a plan confirmation is promised at least the present value of what it would receive in a liquidation. [FN28] If there is no bid for the reorganization business, the business is usually liquidated, dissipating any value of the assets as an ongoing concern and eliminating the value of control, ownership and going-concern value. If there was going-concern value, then the estate suffers. [FN29] By definition, a confirmed plan promises to capture something more for the estate by giving the business an opportu-nity to succeed as a viable entity. Purchase of an asset that will otherwise be lost is an obvious benefit to the estate because, absent error, the purchase will always encompass at least the value to be distributed in the liquidation alternative.

Moreover, while there are clear incentives at work for the DIP to undervalue the business, there are also counter-incentives at work to drive the price up to or above its fair market value. Most of the incentives are most acute in small business reorganizations, the very cases where concern about the market failure is also at its peak.

Sometimes old equity needs the reorganizing business to survive for reasons beyond the likely profits to be gained from the business. Tax-driven partnerships, for example, in which old equity may suffer enormous tax reversals if the business fails too soon after inception, may be willing to make capital infusions into the business that far exceed the value a third party would place on the business. [FN30] Similarly, control of the business may permit an equity owner to employ herself and other family members, thus avoiding the need to seek out new jobs, to end a comfortable working relationship, or to move to a new community. Such benefits might cause an old equity owner to bid an above-market price for the company.

Old equity may also bid for ownership and control for reasons economists identify as "psychic income." Some people will work hard to keep a business in the family, particularly one that bears a family name or identity. Others will work hard simply to avoid admitting defeat, even if they could be profitably employed elsewhere. Some people are embarrassed by their failure to pay and will work hard to repay their debts through their business. [FN31] Other people like working for themselves or being the boss more than they like working for others. Control permits parties to indulge these desires, even if the market would give them similar or even higher financial compensation if they discharged their debts and worked for someone else. Although those who do not share the same views may scoff at anyone who would put human capital into lower-valued use as measured by monetary reward, the market

for control of small businesses is significantly affected by the value people place on this "psychic income."

Another reason old equity may pay an above market price for the control of the business is that old equity may be able to make some special contribution that will make the business worth more in its hands than it is worth in the hands of a third party. If the owner/manager has personal attributes to bring to the business, both the manager and the business may profit from those attributes. When, for example, the owner of the business also personally owns the building which is leased to the business at favorable rates, the rental arrangement will continue if the owner stays in the reorganizing business, but it will not continue if the owner is squeezed out. Similarly, the owner/manager who has all the business contacts, who is the sister-in-law of the primary supplier, who holds the key patent, who knows the brewing process, who knows the names of all the customers' children, who belongs to the same community organizations as the customers, who drives in the same carpools, who is a well-known former sports figure, and so on, brings special value to the reorganization effort. [FN32] Without the company, the owner/manager cannot exploit the value of such benefits, and without the owner/manager the company is worthless. The very factor, noted earlier, that contributes to the thinness of the market for the purchase of a small business may also contribute to an owner/manager bidding more than the market price for the business. In such a case, the owner/manager may bid more than anyone else will bid, simply reflecting that the company is worth more in her hands than in the hands of anyone else.

It may be in some cases that an equity owner will offer an above-market price for the business even when it is not a matter of economic or psychic rationality to do so. Old equity may be hopelessly optimistic ("terminal euphoria" in the words of one judge). An owner/manager may be endlessly able to convince herself of the potential of the business, not based on superior information, but by selectively ignoring the information available.

So long as an owner/manager has access to outside capital, she may be willing to invest in a business' reorganization far past the point of reasonable expectations of return. [FN33]

Of course, an owner/manager may value the reorganizing business higher than do strangers, but if there is no reason to bid that higher valuation, the owner/manager will not do so. There are, however, a number of constraints in the Bankruptcy Code designed to encourage old equity to bid up the price offered for the post-reorganization business. Moreover, the available empirical data suggest that owner/managers often bid more for the business than the current market price.

The first, and most obvious, constraint on low-bidding debtors is the presence of some potential market discipline. Notwithstanding the thinness of the market, some market may exist. If old equity proposes to purchase ownership and control from the bankruptcy estate, it must show that it is offering a fair price. [FN34] If the price offered is too low, others can bid. Notwithstanding the DIP's protected right to propose a plan during the period of exclusivity, it inheres within the plan confirmation process that a proposed sale of any asset—including control, ownership, and going-concern value—involves valuation, and valuation necessarily involves inquiry into market prices. If a DIP proposes to purchase control of the reorganizing business at less than a fair market price, creditors can argue that the plan is not proposed in good faith [FN35] and that the DIP is violating a fiduciary duty to the estate. [FN36] Creditors can challenge the plan, offering other, higher bids as evidence of a higher valuation in the market. The possibility of other bidders, an event that occurs in some small bankruptcies, [FN37] imposes some discipline on old equity to offer a price closer to the market price.

In the case of a reorganization, there is one group with a keen interest in creating a market for the reorganizing business. The creditors who stand to lose if the price paid for ownership and control is too low have an interest in developing a market for the failing business. Unlike the ordinary debtor-credi-

tor relationship where the creditor expects to see little profit from a rising value of the business, the creditor facing debt discharge on the sale of a business through plan confirmation will profit directly from any attempts to develop a market for the purchase of the debtor company. The creditors are often sophisticated business people who can look elsewhere for investors if they believe that the proposed sale price of the business is a bargain.

Sometimes the creditors themselves will decide to purchase the equity ownership. As a group, they have certain bidding advantages. Unlike strangers to the business, these creditors already have borne certain information costs to value the business. During the reorganization, some creditors will carefully monitor the information coming from the business. Their start-up costs to identify a bargain price and overtake it with their own bid are lower than for most third-party investors.

Moreover, when they bid, the business' creditors have a special benefit in knowing that they can be the beneficiaries of what they spend. Because the equity contributed to the business in the plan confirmation can be distributed right back to the creditors who are facing discharge, their bid is functionally different from that of a third party: they know they can recover a portion of their bid in a distribution from the estate. [FN38] In effect, part of the money with which they bid is money that will otherwise be lost to them through discharge.

An example of this point may be useful. Consider a debtor with no unencumbered assets that can be sold in liquidation and $550,000 in unsecured debt. If one unsecured creditor were owed $500,000 and ten other unsecured creditors were owed $5,000 each, the creditor with the large, dischargeable debt would have a sizeable advantage in bidding for the business. A stranger might bid $55,000 for the going concern business, valuing the assets higher in a going concern context and perhaps wanting to take advantage of the company's established good will, current employee base, steady traffic at the current location, customer lists, and so on.

Absent expenses (to keep the problem simple), such a sale would result in a ten percent pro rata distribution to all the creditors, for a total dollar payment of $50,000 to the large creditor and $500 to each small creditor. If the large creditor believes the bid price is too low, it can bid more. The large creditor can bid $56,000, for example, but it will not actually pay $56,000. To be sure, the large creditor will write a check for $56,000, but it will receive $50,500 back immediately as its pro rata distribution. The remaining $5,500 would be distributed in $550 lots to the other ten creditors who are now getting a 10.18% return on their debt. The large creditor would forgo a $50,000 distribution from the outsider's bid and would have made a net distribution to the other creditors of $5,500, for a total out-of-pocket cost of $55,500 for its $56,000 bid. If the bidding escalated, the difference between what the largest creditor would actually pay and an outsider would pay would continue to diverge, with the relative advantage for the large creditor growing with each bid. This illustrates the superior position of the large, unsecured creditor to impose a discipline on any bid offered for the reorganizing company.

The factors that shape the calculation will vary from case to case. Multiple creditors who bid for reorganizing businesses face problems of coordination. Creditors who are owed a small portion of the outstanding dischargeable debt cannot leverage their positions as much as creditors who command a large portion of the outstanding debt. Creditors with access to credit or with greater expertise in running the debtor's business can value the business and bid more readily than creditors with neither advantage.

The degree to which a creditor's possible bid for the business imposes some market discipline on the DIP's bid for the business varies, but again the special circumstances of the smaller business are worth noting. In the cases where the concerns about self-dealing are most intense—small businesses with little market for their ownership and control—the possibility of a single creditor or small group of creditors who can buy the control of the business if they so choose is most likely to impose some market discipline.

In a small business, with dischargeable debt usually concentrated in the hands of a few creditors, the problems of coordination are at their lowest, concentration of debt may be high, and the opportunity for creditors to insist on reasonable valuation may be strong. Even the threat of entry can give an active creditor some influence over equity's bid for the business.

In addition, bankruptcy procedures help reinforce the development of a market. Information is necessary for market bidding, and companies in bankruptcy are subject to revealing considerably more about themselves than are other companies. Disclosure requirements are extensive, and the DIP must be prepared to sit for extensive examination by the creditors. The information so revealed makes it easier for some market discipline to intrude on the DIP's bid. The Code also facilitates bringing together the creditors through the creditors' committee to help overcome their problems of collective action, [FN39] again promoting some market discipline. The court's inquiry in applying the so-called "new value exception" to the absolute priority rule, discussed at length in the next section, invites creditors to bring alternative valuations, including their own willingness to bid, into the plan confirmation process. In short, much of the bankruptcy process is oriented toward obtaining a market price for the value of the reorganizing business.

The DIP's period of exclusivity to propose a plan might seem to work against achieving a market price for the company because it bars competing plans of reorganization for one-hundred and twenty days. [FN40] I would interpret that rule differently, however, seeing it as a rule designed to give the debtor breathing space to develop a plan instead of forcing it to fight a rear-guard action against a liquidating plan or some other proposed reorganization on the first post-filing day. The rule is not designed to give the debtor a bargain price. At any time a plan is proposed, the creditors have the opportunity to object to the plan [FN41] and to be heard on the question of valuation of the assets and the prices set in the plan.

[FN42] This is the creditor's opportunity to tell what others would pay for the business. If a market has developed, either because other potential buyers are on the scene or because the creditors are interested in a purchase themselves, even during the period of exclusivity, valuation and the resulting questions of plan confirmation are necessarily affected. [FN43]

When coordination problems are manageable and information is widely shared, but the creditors see no reason to act, it may be that they are persuaded that the business in their hands really is not worth as much as old equity is willing to put into it. Perhaps they recognize that it takes the participation of the owner/manager to enhance the value of the business or perhaps they believe that the owner/manager simply overvalues the business. If this is the case, then we can presume that old equity's purchase is the best valuation the estate can get.

Even if the creditors are uninterested in the reorganization process, other chapter 11 structures are designed to examine the bid for control by old equity. The court is charged with making its own inquiry into the adequacy of the price for ownership and control, although the procedures are somewhat indirect. The DIP must show, for example, that the plan of reorganization is feasible. [FN44] This means that the DIP must come forward with evidence about the likely success of the business, even if no one objects to the plan. This requirement puts the DIP in a difficult spot if the plan proposes a low-price sale of ownership and control of a business while it also alleges that the business is stable and headed for financial success. [FN45]

Circumstances differ in each chapter 11 reorganization so that the likelihood of a viable alternative to the DIP's bid for the business may be more or less remote. Whether a bid comes from strangers to the business or from a creditor-led group, whether it is a competitive, formal bid proposed as an alternative plan or only a threat lurking at the edges of plan confirmation, the possibility of some market discipline, even in the case of small businesses, cannot be dismissed. The court is invited by the Code to exercise its

own supervision over pricing in the plan confirmation. Moreover, the possibility that the DIP will be anxious to retain ownership and control, for a number of financial and nonfinancial reasons, has a potentially powerful influence on the bidding process.

The strength of the incentives to develop a market for the reorganizing business is not entirely theoretical. In a number of published opinions, creditors have fought the debtor's proposed plan by proposing their own purchase of the business. [FN46] Moreover, empirical evidence suggests that in about half of the small business reorganizations, owner/managers propose to pay the creditors in full—even in the absence of evidence that the market values the business so highly. [FN47]

The balancing act in bankruptcy policy should be in focus. The DIP has an opportunity for self-dealing in a thin market, making DIP purchases in reorganization highly suspect. The risk of cheating the estate of value can be eliminated if the DIP is barred from participation in the post-reorganization business. But the cost of eliminating that risk is high. The DIP also may be the best source of financing for the new business, so barring DIP participation also robs the estate of its best opportunity to realize the value of the going concern. The risk of self-dealing in a thin market must be weighed against the possibility of capturing going-concern value that would otherwise be lost.

A number of factors reduce the effects of both the thin market and DIP self-dealing, holding out the promise of developing market value for the reorganizing business. The circumstances of the small business case are most likely to engender the problems of owner/manager participation, but also most likely to benefit from owner/manager participation. The willingness of a DIP to bid on a reorganizing business is some evidence that there is value to be captured in a reorganization effort. The estate, and hence the creditors, will benefit from capturing rather than dissipating that benefit. The risks of DIP participation are clear, but this analysis suggests that the superior bankruptcy rule is to permit participation under some circumstances rather than to deny the DIP any role in a reorganization plan. [FN48]

*The Distributional Issues of Preserving Value for the Estate.*—The explicit normative premise of this Article is that reorganization procedures are best evaluated in terms of whether they bring the best price to the estate for the assets sold, including the best price for the sale of control, ownership, and going-concern value. If the above descriptions of the reorganization effort as a sale of the business under the mixed influence of DIP bidding is accurate, then the obvious next question is how bankruptcy law should account for these influences. In short, what practices should bankruptcy law implement in order to increase return to the creditors and maximize the possibility of a successful reorganization?

It is important at the outset to note that any rule of DIP purchase has an effect far beyond the number of times such a rule is invoked in court. When a business attempts a reorganization through chapter 11, it works to negotiate a consensual plan with its creditors. The contours of that plan, however, depend critically on the leverage of the parties. Leverage may be drawn from two sources: factors exogenous to the bankruptcy rules, or leverage conferred by the bankruptcy rules.

Some leverage in a negotiation comes from such marketplace factors as the ability of a manager to transfer her skills to another business enterprise or a trade creditor's knowledge that if the debtor is to succeed, it will need future credit from that creditor. Other leverage is conferred by the bankruptcy laws, sometimes directly—as in the valuation of an allowed secured claim under section 506 [FN49] with the concomitant loss of interim interest for the undersecured creditor—and sometimes more subtly—as in the relatively modest sanctions likely to follow from a debtor's use of cash collateral prior to any court orders to preserve the cash. The line between the two sources of leverage is not bright: while bankruptcy rules can affect the value placed on any other marketplace leverage, marketplace leverage can sometimes override any leverage dispensed through the bankruptcy laws.

Under current law, if the parties do not work out a negotiated settlement through a consensual plan, the debtor has the opportunity to force a plan on the creditors. [FN50] The forced plan—or cramdown, in the graphic language of the trade—must meet specified requirements to protect the creditors, but the critical feature of the Code is its provision for plan confirmation without full creditor consent. If only consensual plans could be confirmed, creditors would retain substantial power and the bankruptcy process would be little more than a mediation forum. With cramdown, a debtor has greater power to confirm a plan and restructure the business. In effect, the cramdown and its ancillary requirements are the heart of the leverage conferred to the debtor by the Code. All negotiations in chapter 11 take place around it. To the extent that each party has the power under the Bankruptcy Code to force the other to yield, that power is reflected in the terms of any consensual plan.

What is the justification for permitting debtors to cramdown? At its most basic, the question harks back to why there is a bankruptcy system at all. I have argued elsewhere that we have two systems to deal with default: a state law collection system to deal with a single default by a solvent debtor and a bankruptcy system to deal with loss allocation and consequent leverage readjustment in the context of multiple defaults and competing interests among creditors when the debtor is insolvent. [FN51] The bankruptcy system follows a normative goal of maximizing return to all the debtor's creditors, while giving the debtor an opportunity to reorganize in order to cushion the effects of failure on suppliers, employees, communities and others who do not have formally recognized claims against the estate. [FN52] By offering a means to reorganize a business, bankruptcy law entices management to make a new bargain: the debtor will reveal information, put all its assets under court jurisdiction, and submit to court supervision in return for the opportunity to restructure debts, reshape the corporation, cancel debt that could not be paid in liquidation, and remain in business. [FN53]

Cramdown enhances value for the estate and distributes that value from the estate among different parties. Since the Code provides a floor in reorganization efforts requiring that creditors receive at least the liquidation value of the estate, cramdown, as it functions in the current system, is a rule of value preservation for the estate. Cramdown preserves the going-concern value of the assets for the estate over the liquidation value. [FN54] Without cramdown, that premium might either be dissipated by piecemeal sale or captured by a hold-out creditor. In effect, cramdown allocates leverage power away from potential hold-out creditors to the estate. The estate, in turn, distributes that premium through the confirmed plan. In the current scheme, that distribution pattern is, at best, fluid. The DIP may propose to pay some or all of the increased value captured in a reorganization effort to the impaired creditors. Alternately, the DIP may propose to put all the excess value into the business' future success, thereby transferring the value to the new equity owners and to others who profit from the continuation of the business, such as the employees, the local taxing authorities, and the business' suppliers. Cramdown allocates leverage power to the estate for distribution to creditors on a pro rata basis and to others who benefit from a successful reorganization.

The distributional aspect of cramdown is worth some elaboration. Cramdown is specifically designed to counter the hold-out value that a creditor class would have if only consensual plans could be confirmed. The rule prevents a creditor class from demanding a premium to consent to the plan, thereby transferring value to itself from all other interests who stand to profit from a reorganization. When it is already promised liquidation value in either a liquidation or a reorganization, the creditor's hold-out value is simply the portion of the increase from liquidation value over reorganization value it can demand for itself as the price of consent. With or without cramdown, in the case of perfect negotiations, if the parties have similar perceptions about the value to be gained

from a reorganization, it is likely a reorganization will occur. In such a case, the consequences of a cramdown rule—or a consent rule—are distributional. In the case of an imperfect market, e.g., when parties misapprehend value or fail to negotiate perfectly, cramdown preserves value that might otherwise be dissipated when a creditor class overvalues its holdout potential.

The normative justification for a cramdown is straightforward. Because I believe that the estate owns all the assets of the post-filing business and that creditors should share ratably in that value except to the extent of certain specifically negotiated priority rights, I have no doubt that a cramdown rule is appropriate. There is nothing in bankruptcy law or policy to suggest that a class of creditors should retain going-concern value for itself rather than share that value with other creditors. To the extent that the cramdown enhances value for the estate that would otherwise be dissipated, it increases the size of the estate to be divided among a number of interests, a benefit for all parties facing loss in a reorganization. [FN55]

*The Distributional Effects of Absolute Priority.*—If a cramdown is generally justifiable, the question nonetheless remains concerning the extent to which old equity should be permitted to participate in a reorganization effort over the objections of a dissenting class of creditors.

Once again, the analysis begins with leverage distribution. A rule denying old equity the opportunity to participate in a post-reorganization business over the objections of creditors will not stop old equity from participating in reorganizations. Regardless of the rule in cramdowns, old equity will propose participation under rules that permit consensual plans. A cramdown rule coupled with a prohibition on old equity participation would have two effects: first, it would allocate greater leverage, and a consequently higher payout, to holdout parties than would a rule permitting participation, and second, it would cause some reorganizations to fail when bargaining breaks down because some creditors overvalue their holdout potential.

The normative analysis permitting old equity participation in post-reorganization businesses follows that of cramdowns generally: permitting such participation will enhance value to the estate. Old equity participation allows a greater number of reorganization efforts to occur. Because the market is exceedingly thin for closely-held, failing businesses, if the primary source of equity contributions is cut off, a greater number of reorganization efforts will fail for want of capital infusions. Some of those capital infusions would be at or above market rates, some would involve an increase in value by combining the particularized attributes of the owner/manager with the reorganizing business, and some would preserve going-concern value for the estate. So long as each creditor is given at least what it would have received in a liquidation, the cramdown involves capturing additional value for the estate without concomitant cost to the creditors. An a priori rule barring participation of old equity results in lost value for the estate, with no obvious offsetting value.

Value is also dissipated whenever a potentially successful reorganization is not accomplished because of negotiation failures. When the creditor overvalues the business or when one or more parties behave irrationally, any rule that bars equity participation in cramdowns will cause some number of otherwise confirmable reorganizations to fail at the inception because they lack equity investment. [FN56]

A rule barring old equity participation whenever creditors object distributes value away from the estate to some creditors. By prohibiting one potential buyer of the estate from participating in a reorganization, a dissenting class of creditors can function as holdouts, capturing a greater part of the going-concern value of the reorganization than that class would receive through a pro rata distribution or some other distribution through the estate. Distribution among creditor classes would depend on a number of factors specific to each case, with the party best able to holdout demanding more than any pro rata distribution would have given it. Instead, rules of cramdown and old equity

participation permit the going-concern value to be captured by the estate for distribution.

To meet the initial normative goal of enhancing value for the estate and distributing that value through the estate, a rule of equity participation, even over creditor objection, is superior to a rule barring such participation.

*The Broader Implications.*—The foregoing suggests that old equity should be able to participate in the reorganization of a business, but it does not suggest that there should be no limits on old equity's participation. The theory encompasses enhancing value for the estate, but it also acknowledges a high risk that the value can be appropriated by the DIP. If the courts consistently undervalue control, permitting the DIP to capture value that should go to the estate, then the normative justification for a rule of DIP participation is undercut. Because a reorganization plan is about capturing going-concern value for the estate, when the DIP participates in the effort, the focus should be on whether the sale maximizes the return to the estate or appropriates that value to the DIP personally.

To maximize return to the estate, it is critical to monitor the DIP's proposed sale whenever the DIP intends to participate in the post-reorganization business. A number of monitoring devices are already imbedded in the structure of the bankruptcy system. The point here is to highlight how Code procedures should be implemented to promote the underlying policy of capturing value for the estate.

The DIP planning to participate in the post-reorganization business has substantial information advantages that permit self-dealing and depress the market for control, notwithstanding the DIP's fiduciary duties. To the extent that the DIP has exclusive information about the assets and operation of the business, the DIP can value the business better than anyone else. Additionally, the DIP enjoys advantages based on the control it exercises. Profitable business deals can be delayed, business activities can be curtailed, and new opportunities can be pushed into the future—all resulting in an undervaluation of

the business. Whenever the DIP manages a business which it plans to buy, the opportunity to keep the price of the business low through management activities is always present.

The decision in the Bankruptcy Code to leave control of a reorganizing debtor in the hands of a DIP is an uneasy compromise. The advantages of having a knowledgeable, experienced manager during a time of financial crisis are balanced by the disadvantages of not having an independent manager who will look out for the interests of the estate and the creditors for whom the estate is being administered. The DIP is a fictional creation, a compromise candidate who theoretically retains the experience of the old debtor management as it develops new independence and loyalty to the estate. The presence of a DIP reflects the fundamental ambivalence in bankruptcy policy between promoting reorganization and protecting creditor interests.

Courts are loathe to replace DIPs without strong indications that they are engaged in fairly serious fraudulent activity. [FN57] The theory of absolute priority suggested here implicates the question of when it is appropriate to take control of the estate from the DIP. When incumbent management is replaced, valuation becomes easier and creditors can know that the value will remain with the estate, and not be dissipated when management leaves. This analysis provides another justification for considering replacement of a DIP in some circumstances.

The Code requires disclosure of information and permits the creditors to demand additional information. More importantly, the idea of disclosure permeates every feature of a DIP's running the business as a trustee for the estate and of attempting confirmation of a plan. DIPs have an affirmative obligation to reveal information about a business fully and quickly. The courts should require such behavior of DIPs and be willing to consider additional monitoring by an examiner or replacement by a trustee for any DIP who is not entirely forthcoming.

There is at least some anecdotal evidence to reinforce the theoretical conclusion that replacing the DIP can make information

more accessible, control more independent, and a market develop where none existed before. [FN58] A weighing process is still appropriate when the court considers ousting current management, and the factors relevant to any particular decision are likely to be highly fact-specific, but this analysis suggests an additional, important factor to use in evaluating the continuing control of the DIP. Those DIPs who fail to maximize the value of ownership and control for the estate should be replaced.

A corollary concern of the courts in monitoring DIP behavior should be helping the creditors develop a market for control of the post-reorganization business. Information requests should be liberally granted. Control questions should be carefully considered. Outside bidders should be encouraged. And, because creditors are the obvious source of an emerging market for the business, procedures that permit creditors to participate in the purchase of the business should be encouraged. Barring creditors from presenting their own plans by extensions of the period of exclusivity or by timing plan proposals so that creditors are disadvantaged in their attempts to establish a market price for the business and compete for purchase of the business is unjustified. In the context of absolute priority cases, such maneuvers simply enhance the already high possibilities for depressing the value of the estate. Creditors should have every opportunity to participate in pricing the business, including the chance to present their own purchase plan.

There is an important corollary to encouraging creditor participation. Creditors who have the opportunity to participate and who do not exercise those prerogatives are participating in the establishment of a market price. The DIP has independent obligations that should be vigorously enforced, even to the point of replacement with a trustee, but a market will not find every business. The creditors who face discharge of debt have a continuing practical interest in the value of the estate. If they are uninterested in purchase and do little to encourage market development, they will—and should—be stuck with the resulting market.

This last point has an interesting implication in plan confirmation: who bears the burden of establishing a market price for the reorganizing business? There can be no doubt that it is first the obligation of the plan proponent, which usually means that the DIP will offer some evidence of the accuracy of the valuation of the business as part of the plan confirmation. But once a prima facie case of value is made, who bears the burden when the creditors complain that the value proposed is too low? Actual liquidation will frequently result in dissipation of value, and threatening to force liquidation allocates value to the holdout party. This suggests that when DIPs can establish that they have met their obligations with regard to information and control and when creditors have had every opportunity to help develop a market, then the creditors bear the burden of showing that the market price for control is higher than that shown by the DIP. In the absence of additional information, if there has been vigilance early in the case to develop a market for the business, that vigilance should be acknowledged at the time of confirmation and creditor holdouts should not be rewarded.

Questions of control and information in managing the bankrupt estate and in proposing a plan of confirmation are central to maximizing return for the estate when a plan is confirmed and control passes to the post-reorganization business. The DIP has an opportunity for self-dealing, often unchecked by market concerns. But when complete and accurate information is easily accessible so that some market for control can develop, the likelihood increases that the estate is receiving maximum value for its assets. These should be the concerns at the heart of the discussion when old equity participates in the post-reorganization business.

## II

### THE LEGAL ANALYSIS

The premise of this paper has been that the function of plan confirmation procedures is to maximize value for the estate in the sale of its assets. A theoretical analysis suggests that value for the estate will be enhanced if plans can be crammed down against dissent-

ing creditors and if old equity can bid for the purchase of control of the post-reorganization business. The analysis also suggests that participation by old equity should be scrutinized to increase the return to the estate when a plan is confirmed. In this section, I review the Code's confirmation rules as they relate to participation by old equity in the post-reorganization business—the application of the absolute priority rule. I also examine the court-created "new value exception" to the rule to see how the courts use it to monitor participation of old equity in the post-reorganization business.

The legal rule of absolute priority had its genesis in the long-standing common law maxim that creditors would be paid ahead of equity. [FN59] This rule assured those who did business with the corporation that if the business were dissolved the creditors would be paid before the insiders would recover their investments. In the case of collapse, the creditors could count on payment in full before equity collected anything from the business assets.

The provision is a form of creditor protection, one of many that attempt to restrict the ability of corporate owners and insiders from depleting a failing business for their own benefit, leaving the creditors with only the empty shell of a business. In part, the rule is designed to offset some of the consequences of superior information and control necessarily available to equity owners when they manage the business or exercise close supervision over the nominal managers. The rules of absolute priority satisfy concerns similar to those of state law rules of dividend distribution, for example, which require that the corporation only distribute stock dividends from earned surplus rather than from general assets of the business. [FN60] As any good law-and-economics devotee could point out, creditors could have insisted on such provisions in advance, but the law provides an off-the-rack ordering among the parties that is nearest to what the parties would likely have negotiated for themselves, requiring that the owners/insiders restrict their abilities to take assets from the business to the injury of the creditors.

*The Absolute Priority Rule in the Bankruptcy Code.*—A rule of creditor priority was adopted unambiguously in the 1978 Code. The Code provides that when a plan is imposed on a dissenting class of creditors:

> (B) With respect to a class of unsecured claims—.... (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property. [FN61]

This is a clear statement that if the unsecured creditors as a class object, equity (a class junior to unsecured creditors) will not receive or retain any interest under the plan because of its old position with the debtor.

The Code section is equally clear on the scope of the prohibition. Two key limitations are relevant to the delineation of the absolute priority rule as it now exists in the Bankruptcy Code.

Section 1129 does not say that any objecting creditor may stop a plan in which old equity participates in the post-bankruptcy reorganization. Rather, the Code provides that acceptance or rejection of the plan shall be by creditor classes. [FN62] Unsecured creditors may vote their pro rata debt, but if the class as a whole accepts the plan by one-half in number and two-thirds in amount of debt, [FN63] the plan is deemed accepted by the whole class—dissenters and all. Individual creditors have no recognized objection. Thus, individual creditors may receive considerably less than full payment under a plan while old equity retains an interest.

Unlike the best interests test which guarantees that each creditor will receive at least as much as it would have received in reorganization, the absolute priority rule restricts distribution to old equity only if there is not an adequate majority of creditors in each class to accept the plan. [FN64] The importance of this observation is simply to highlight that the absolute priority rule is not an absolute statement that creditors will always prevail over old equity. Such a provision could have been written into the Code, but it was not. The distributional impact is unmistakable: the absolute priority rule cannot even be called into question by a creditor who is too small to dominate its class. The

holdout value for a single creditor is correspondingly reduced over the blunt statement of creditor priorities at common law. Majority rule, and a correspondingly greater support of the DIP's reorganization effort, prevail.

The second limitation on the application of the Code's absolute priority rule is defined by the wording of section 1129(b)(2)(B)(ii). When a creditor class objects, the Code provides that old equity shall not receive or retain any interest under the plan "on account of such junior claim or interest." By its own language, the absolute priority rule limits old equity's participation in the post-reorganization business only to the extent that old equity claims a share of the estate based on its pre-bankruptcy equitable ownership. The Code does not prohibit old equity from becoming a post-petition financer of the business or a post-plan owner of the business. The Code leaves old equity in the position of any other potential investor: it may offer to buy any of the assets of the estate on the same terms as any other buyer.

Some commentators argue that the estate is not buying on the same terms as any other buyer because it enjoys a better position than all other buyers in chapter 11. Nothing in the Code gives equity such a beneficial position. If courts are in fact giving them enhanced status, they should not do so. Exclusivity, for example, goes to the question of DIP organization and presentation, not to the question of plan content for equity owners, particularly if the proposed plan contemplates purchase for a sub-market price. The correction to these problems, if they exist, lies in not giving equity any purchase advantage in chapter 11 reorganizations, not in barring them from participating in the purchase of the chapter 11 business.

*The "New Value Exception" to the Absolute Priority Rule.*—The "new value exception" to the absolute priority rule was first articulated in *Case v. Los Angeles Lumber Products Company.* [FN65] The exception provides that old equity may become the owner of the post-reorganization business if it provides substantial new value that is necessary for an effective reorganization. The exception has been cited by a number of courts since then and has been used repeatedly to explain the participation of old equity in business reorganizations.

In the course of deciding that a promise of future work would not qualify for a "new value exception" to the absolute priority rule, the Supreme Court in *Norwest Bank Worthington v. Ahlers* [FN66] dropped a footnote noting that it was not deciding whether the exception articulated back in the 1930s survived the adoption of the new Code in 1978. [FN67] Both Judges Posner and Easterbrook of the Seventh Circuit later seized on this opening to declare their own doubts about the continuing viability of the rule. [FN68]

Notwithstanding the readiness of Judges Easterbrook and Posner to discuss the likely demise of the "new value exception," only a few bankruptcy courts and no appellate courts have held that there is no "new value exception." [FN69] The Fifth Circuit has the question under consideration in In re Greystone III Joint Venture [FN70] as this Article goes to press. The clear majority view is that the judicial rule survives until Congress explicitly terminates it. [FN71]

Although the rule likely survives on any reasonable reading of both the history and the adoption of the 1978 Bankruptcy Code, it is appropriate to focus on the fact that the rule itself never created an exception to the closely articulated absolute priority rule. No "exception" survives, because none was ever created. Los Angeles Lumber and its progeny use the language of "exception," but the cases do not create one. Instead, they simply set forth important considerations for reviewing the bargain as old equity proposes to purchase control of the post-reorganization business.

The "new value exception" to the absolute priority rule is inaptly named. It does not permit old equity to participate "on account of such junior claim or interest," which is flatly prohibited by statute. Nothing in the "new value exception" purports to create an exception to the Code requirements or to permit old equity to gain any advantage based on its pre-bankruptcy equity ownership.

There is no "exception" to the Code, nor is there any need for one in order for old equity to participate in a plan of reorganization. Because there is no Code restriction on the participation of old equity as a purchaser of any asset of the post-reorganization business, including the purchase of control, there is no need for an "exception" to permit old equity to offer to buy the business. Instead, the "new value exception" is used to restrict the participation of old equity if it offers to purchase equitable ownership of the post-reorganization business under section 1123(a)(5)(D). [FN72] The "new value exception" controls how old equity can participate in the post-bankruptcy company—something not restricted anywhere in the Code.

The source of the confusion may come from the somewhat loose articulation of the early rule of absolute priority. Because the absolute priority rule itself was not clearly articulated in the 1898 Act, [FN73] but instead was developed by the courts under the requirement that the plan must be "fair and equitable," the courts developed something less than a precise articulation of its boundaries. The absolute priority rule was generally known from its common law antecedents. As the Supreme Court noted before the turn of the century in *Louisville Trust Co. v. Louisville, N.A. & C. Ry. Co.*:

> [T]he stockholder's interest in the property is subordinate to the rights of creditors; first of secured and then of unsecured creditors.... [A]ny arrangement of the parties by which the subordinate rights and interests of stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation. [FN74]

Even in this early discussion the Court focused on whether stockholders were profiting because of their "prior rights," rather than because of a proposed new relationship with the debtor.

Early courts recognized that creditors may be protected by making deals with equity and that neither common law nor bankruptcy law required that equity be forced out of all participation in the post-bankruptcy business. In 1926, the Supreme Court noted:

> [g]enerally additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases, the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights. [FN75]

The "new value exception" later articulated in Los Angeles Lumber simply reinforced the already-established view that equity could not participate on account of its earlier position, but that when it made a "fresh contribution" it could "receive in return a participation reasonably equivalent to [its] contribution." [FN76]

Perhaps the "new value exception" would have been better named the "scrutinize old equity participation rule" or some other more descriptive term. An accident of history results in a term that continues to mislead. But whatever the name, functionally the Code restriction is limited and the common law interpretation of it does nothing to change the Code provisions.

Restrictions on Purchases by Old Equity.—Because there is no Code rule prohibiting old equity from participating in a proposed plan of reorganization based on new (post-filing) dealings with the estate, the "new value exception" does not give equity something otherwise prohibited by the statute. Indeed, the operation of the "new value exception" and the restrictions incorporated in it are precisely inverted; without a "new value exception" rule, there would be no specific constraint on the dealings between old equity and the DIP beyond the general reminders that the DIP acts in the interests of all the creditors, the ordinary restrictions on the sale of the assets of the estate, and the like. [FN77] The "new value exception" modifies the Code rules by providing greater creditor protection than do the specific statutory rules.

The clarification of the function of the "new value exception" is important to the operation of chapter 11 reorganizations. Because the "exception" is often discussed as if

it were created for the benefit of equity holders, the emphasis in applying the rule is often in the wrong place. The better analysis is to see the "exception" as a judge-made tool to monitor the relationship between old equity and the new DIP. It is not the case that the exception permits old equity to qualify for a bonus; instead, the exception is designed to shape an inquiry into whether the interests of the estate—and thereby all of the creditors—are being fully protected.

The elements of the "new value exception" illustrate its focus. The courts look at a number of factors which are repeated through the cases. [FN78] By the courts' terms, to qualify to purchase control under the plan of reorganization, old equity must offer value that is:

*New.* The value must be new, not the old contribution. This effectively repeats the requirement of section 1129(b)(2)(B)(ii) that old equity cannot take an interest on account of its previous ownership interest.

*Substantial.* The value must be something more than nominal. This rule evidently functions to assure that there is not only a purchase in form, but also in substance—that the DIP is putting up something more than a token amount for the control and going-concern value.

*Reasonably Equivalent.* The value offered must be reasonably equivalent to the value received; that is, old equity must be offering a fair price for the equitable ownership of the post-reorganization business.

*Necessary for an Effective Reorganization.* If the money is not needed in a reorganization, or if a reorganization is not planned, old equity cannot purchase the new equitable ownership. [FN79]

*Money or Money's Worth.* The value offered should not be illusory. The courts require that the valuation of what is offered not be speculative, contingent, or uncertain. These elements give the court the opportunity to scrutinize the fairness of the deal struck between the DIP on behalf of the estate and old equity. By asking for evidence on these elements when old equity proposes to participate in a nonconsensual plan, the court gives

creditors an opportunity to challenge the deal offered by objecting to the terms on any of the bases listed above. The terms of sale of an important estate asset—control of the business—are substantively reviewed in the confirmation.

*A Misleading Exception.*—A theory of absolute priority is helpful in evaluating both the formal structures and the actual functioning of the bankruptcy system. The Code provides for capture of going-concern value for the estate by permitting cramdowns and old equity participation, consonant with a theory of bankruptcy directed to maximizing value to the estate. The court-created practice adds an element of scrutiny to proposals that involve old equity participation in new plans. Scrutiny is entirely appropriate to the theory of absolute priority advanced here, but as it is practiced, the fit is somewhat rough.

The key difficulty with the current methods of scrutinizing plan confirmations is that the doctrinal designations are not always well-directed to satisfy the theoretical structure developed here. As a result, some plan confirmation procedures are not likely value-enhancing. Moreover, some confusion arises about the contours of the exception.

Judge Easterbrook's opinion in Kham & Nate's Shoes is illustrative. [FN80] Although he questions whether a judicially-created "new value exception" survives following the adoption of the 1978 Bankruptcy Code, in fact he applies the rule. In holding that old equity could not purchase the business under the plan of reorganization, Judge Easterbrook noted that equity had only offered loan guarantees—no money or money's worth. [FN81] He wrote that such an offer was "intangible, inalienable, and unenforceable by the firm ... '[with] no place in the asset column' of a balance sheet." [FN82] Judge Easterbrook said he did "not know whether these guarantees have the slightest value" and therefore did not meet the test of the new value exception. [FN83] He distinguished an earlier Seventh Circuit opinion permitting a purchase by old equity, [FN84] a case relied on by the debtor, noting that in the earlier case old equity has put up $34,800 in cash in addition to proffered guarantees.

According to Judge Easterbrook, any cash offer in Kham & Nate's Shoes would have presented a different case for which the appropriate question would have been valuation. [FN85] Judge Easterbrook was clear that old equity—just like everyone else—should be able to purchase post-bankruptcy equitable interests, so long as they do so for real money.

Because Kham & Nate's Shoes did not pass the current strictures of the "new value exception," Judge Easterbrook was denied the opportunity to declare the exception dead. He did, however, go beyond what was required in the opinion to express his "doubt" about the continued viability of the rule. His concern is based on his assumption that somehow the "exception" permits old equity to purchase the post-bankruptcy business without concern for the value of the business in the marketplace. [FN86] There is, however, no legal basis for his concern. If the creditor believes the debtor is purchasing the business for less than fair value, the creditor can always, even during the period of exclusivity, present evidence of higher valuation. If the evidence is credible, the court cannot confirm the sale for less than the newly-established fair market price. Indeed, the "new value exception" that seems to alarm Judge Easterbrook is specifically designed to raise the question of valuation in the context of possible self-dealing—the very concern he raises as he assaults the viability of the rule. The language of "exception" has surely been misleading in this case.

The depth of the confusion is made even more apparent in another Seventh Circuit opinion, *In re Met–L–Wood Corporation*. [FN87] In that case, the chapter 11 business was sold on a going-concern basis through an auction held shortly after filing. Much later, as a plan detailing the distribution of the proceeds was about to be confirmed, the creditors discovered that the purchaser at the auction was the undisclosed agent of old equity. When they complained, Judge Posner ratified the sale, holding that "[i]t is commonplace, and involves no impropriety, for the debtor himself to bid at a foreclosure sale." [FN88] Judge Posner is

no doubt right that equity can bid at public sales, and he focuses on one aspect of the bankruptcy policy articulated here: permitting equity participation in the post-reorganization business. But in assuming that an auction sale must have brought the market price, Judge Posner ignores the possibility of DIP self-dealing. Testimony in the bankruptcy court indicated that the only bidder was the agent of the DIP. Had the creditors in Met–L–Wood known that the better-informed DIP planned a quick purchase of the business, they might have behaved differently. They might have been willing to bid themselves or they might have delayed the sale while they sought other bidders. They might have scrutinized the sale more closely. By concealing its identity as the bidder in the auction, the DIP was able to appropriate important valuation information from the estate to itself. That superior information permitted the DIP the opportunity to capture value that belonged to the estate.

In Met–L–Wood, the rubric of the "new value exception" again failed the court. Because old equity's purchase of the ownership interest was not couched in terms of the confirmation of a reorganization plan, nothing triggered the heightened scrutiny of the absolute priority rule or the "new value exception." As a result, Judge Posner saw no need to examine the transaction, treating the auction sale as adequate without regard to the circumstances. In effect, he issued an invitation to the clever DIP to use the right form and escape any court review. [FN89] By comparison, a focus on scrutinizing any sales of estate property to the DIP works to protect the state, regardless of the nominal description of the sale or when it occurs.

Published opinions from the bankruptcy courts track the analysis used here much more closely than do the opinions of the circuit courts. In the past few years, a number of bankruptcy courts have ruled on proposed equity purchases of post-reorganization businesses. The courts have permitted a cramdown only when old equity came up with substantial cash outlays, [FN90] but have refused to confirm cramdown plans when the DIP has offered to purchase control for something less than a substantial

cash offer. [FN91] The presence or absence of cash is not, of course, the only issue in valuation, but the bankruptcy courts seem to be making a close inquiry into whether the DIP is walking off with a bargain that rightly belongs to the estate.

## CONCLUSION

In this Article I have suggested a theoretical analysis of the problem of absolute priority. Plan confirmation can be best understood as the sale of control, ownership, and going-concern value of the business, a sale that is the functional equivalent of the sale of any other asset of the estate. Bankruptcy procedures should be evaluated in terms of whether they enhance the value of the estate. Such value is best enhanced by a rule of cramdown and by permitting old equity to bid for the assets of the reorganizing business. Such transactions are laden with the risk that the DIP will not work to enhance value for the estate, and that the preferred solution is to monitor transactions between the DIP and the estate, rather than to bar the DIP from participating in any post-reorganization business.

The theoretical analysis of absolute priority offered in this Article is not articulated in the ordinary debates over plan participation. Nonetheless, the analysis developed here is consonant with the formal and the operative structure of the Code. The Code provides for cramdown and permits old equity to participate in the post-reorganization business, allowing the estate to capture the value of the ownership and control of the business. The "new value exception" to the absolute priority rule provides a framework for creditors and courts to scrutinize the transaction between the DIP and the estate, so that the DIP is neither barred from participation nor given unsupervised access to the control of the business.

To the extent the theoretical analysis suggests modification of the formal structure would be appropriate, shifting emphasis in the application of certain rules of the Code is more appropriate than requiring formal changes in the rules themselves. A more clearly developed theory of old equity participation in the reorganizing business may help to refocus attention from the form of the transaction to the underlying substantive question of valuation. A more clearly developed theory may also help expose the structure of the implicit bargain between the debtor and creditor at the time of the bankruptcy filing, a point which has ramifications in the interpretation of the rights and obligations of the DIP throughout the pendency of the bankruptcy case.

Just as questions of the relationship between creditors and equity are at the heart of corporate law, they also occupy the center of bankruptcy law. A seemingly endless supply of disputing creditors and DIPs trying to salvage struggling businesses will assure that the courts will continue to wrestle with the problems of absolute priority. The underlying problems of valuation will never go away, but it may be possible to develop clearer lines of analysis from a more theoretically informed understanding of the structure of the bankruptcy system.

FNa1. Elizabeth Warren is William A. Schnader Professor of Commercial Law, University of Pennsylvania Law School. I appreciate the thoughtful comments of Douglas Baird, Lynn LoPucki, Michael Moore, Edward Rock, Alan Schwartz and Jay Westbrook on an earlier draft of this Article. The Honorable Robert Ginsberg, U.S. Bankruptcy Court, Northern District of Illinois, shares some blame for this Article for insisting that issues in this area were pressing and that I should labor in this field. Finally, I note that I wrote an amicus brief for the Fifth Circuit in the pending matter of Greystone III Joint Venture v. Phoenix Mutual Life Insurance Company. I did not represent any of the parties in the case, nor did I receive any compensation for the brief. I did, however, make arguments there that are repeated in parts of the following Article.

[Editors' Note—With the permission of the author, and in the interest of timely publication, this Article has been subjected to an abbreviated production process and remains in essentially the form in which it was submitted.]

FN1. 11 U.S.C. § 1129(b)(2) (1988).

FN2. See, e.g., Ayer, Rethinking Absolute Priority After Ahlers, 87 Mich.L.Rev. 963 (1989) [hereinafter "Rethinking Absolute Priority"]; Baird and Jackson, Bargaining After the Fall and the Contours of the Absolute Priority Rule, 55 U.Chi.L.Rev. 738 (1988); Nimmer; Negotiated Bankruptcy Reorganization Plans: Absolute Priority and New Value Contributions, 36 Emory L.J. 1009 (1987); Peeples, Staying In: Chapter 11, Close Corporations and the Absolute Priority Rule, 63 Am.Bankr.L.J. 65, 84 (1989) [hereinafter "Close Corporations"]; Skeel, The Uncertain State of an Unstated Rule: Bankruptcy's Contribution Rule Doctrine After Ahlers, 63 Am.Bankr.L.J. 221 (1989).

FN3. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197 [108 S.Ct. 963, 99 L.Ed.2d 169] (1988); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351 (7th Cir.1990); *In re Stegall,* 865 F.2d 140 (7th Cir.1989). *In re Greystone III Joint Venture,* 102 B.R. 560 (Bankr.W.D.Tex.1989), which involves questions of the absolute priority rule, is pending in the Fifth Circuit as of this writing.

FN4. 11 U.S.C. § 541(a) (1988).

FN5. "Control and ownership" refer to all of the ordinary aspects of corporate ownership, including directing the business activities and taking full profits from the operations.

FN6. This view of the estate as seller of the assets is consistent with a number of other scholarly works. Professor Baird begins his discussion of The Uneasy Case for Corporate Reorganization, 15 J.Legal Stud. 127 (1986), with the observation that a chapter 11 proceeding involves the hypothetical sale of assets. Professor Baird and I might disagree over precisely what is sold in the plan confirmation, but we share the view that conceptualizing the confirmation of a plan as a sale is useful in understanding the chapter 11 process. Professor Clark also makes the point that an involuntary confirmation is in effect an enforced sale. Clark, The Interdisciplinary Study of Legal Evolution, 90 Yale L.J. 1238, 1250–54 (1981).

FN7. 11 U.S.C. § 1123(a)(5), (b)(4) (1988).

FN8. This expansive reading of the property of the estate is, I believe, justified by the language of the Bankruptcy Code, the legislative history of the Code, and bankruptcy policy. I recognize, however, that the proposition has implications at the margin that may be controversial. I leave those debates for another day.

FN9. 11 U.S.C. §§ 1123(a), 1129(a) (1988).

FN10. The creditors need only consent by class. The Code does not require that each creditor consent to the participation of old equity. Id. § 1129 (1988).

FN11. Id. § 1129(a)(7) (1988).

FN12. For example, the University of Texas sponsors a very popular annual seminar devoted exclusively to valuation of assets, for which seminar speakers produce a heavy volume of materials each year.

FN13. The automatic stay, cash collateral, adequate protection, claim allowance, best interests, feasibility, classification, eligibility, lien stripping, section 1111(b) elections, equitable subordination, fraudulent conveyances, voidable preferences, pendency interest, and impairment are just some of the bankruptcy concepts that turn critically on valuation.

FN14. See, e.g., Rock, Antitrust and the Market for Corporate Control, 77 Cal.L.Rev. 1365, 1378–80 (1989) (sources cited therein).

FN15. See, e.g., Dickson, "Vulture Funds" Move in on Ailing Companies, Fin.Times, June 18, 1990, at II; Morgenson, And Now, a Vulture Fund, Forbes, Oct. 3, 1988, at 12.

FN16. The data on success rates for businesses after they emerge from chapter 11 are virtually nonexistent, and the data that are available are problematic, in part, because of the difficulty of defining success in reorganization. Recent estimates of success vary, but they are consistently low. See Flynn, Statistical Analysis of Chapter 11, Admin.Office of the U.S.Cts., at 10–11 (1989) (estimating a 17% confirmation rate). Professors LoPucki and Whitford find a much higher confirmation rate of about 89–96% among the biggest cases filed during 1979–88, but they infer that the size of the case was an important factor in pushing up confirmation rates. See LoPucki & Whitford, Ven-

ue Choice and Forum Shopping in the Bankruptcy Reorganization of Large, Publicly Held Companies, 1991 Wis.L.Rev. 411, 431 n. 105.

FN17. See Schwartz, A Theory of Loan Priorities, J.Legal Stud. 209 (1989); Scott, A Relational Theory of Secured Financing, 86 Colum.L.Rev. 901 (1986); Marsh, The Choice Between Equity and Debt: An Empirical Study, 37 J.Fin. 121 (1982).

FN18. Some outside investors may be willing to become owner/operators or install their own management in order to protect an equity investment, but the need for such activity necessarily limits the market for investment in closely-held businesses. The pure investor must place a lower value on such an investment.

FN19. See infra note 32 and accompanying text.

FN20. Of course, some investors see current management as depressing the value of the business and anticipate that the business will be more profitable when another manager is in control. In that case as well, an outside investor must engage in some valuation effort that separates the effects of current management from other business prospects.

FN21. Professors Brudney's and Chirlstein's concern is echoed by the American Law Institute, but their proposal to ban management is not. The Delaware courts generally have the same concern over management participation, and they scrutinize management's proposals without banning them outright. Other corporate analysts argue that management buyouts ("MBO's") provide a number of efficiencies and see little reason for such intense scrutiny. See, e.g., Booth, Management Buyouts, Shareholder Welfare, and the Limits of Fiduciary Duty, 60 N.Y.U.L.Rev. 630 (1985).

FN22. LoPucki, The Debtor in Full Control—Systems Failure Under Chapter 11 of the Bankruptcy Code?, 57 Am.Bankr.L.J. 247, 267–68 (1983) [hereinafter "Debtor in Control"].

FN23. The problem of absolute priority is very different in most publicly-traded corporations. Based on their ground-breaking study of the largest, confirmed chapter 11 cases during 1979–88, Professors LoPucki and Whitford noted a high rate of participation of pre-bankruptcy stockholders in confirmed plans in clear contravention of what they would be expected to receive in light of the absolute priority rule. In the overwhelming majority of cases, the old stockholders were given some interest, albeit limited, in the post-reorganization business even though creditors were not paid in full. Professors LoPucki and Whitford conclude that equity's participation in these consensual plans can be explained by a community sense that parties who show up at the bargaining table generally should receive something under the plan in order to assure their cooperation—even if they had no legal grounds to object. This is obviously a different phenomenon from the one at work in the case of closely-held companies where old equity controls the DIP and proposes to control the post-reorganization business. LoPucki and Whitford, Bargaining Over Equity's Share in the Bankruptcy Reorganization of Large, Publicly Held Companies, 139 U.Pa.L.Rev. 125 (1990) [hereinafter "Bargaining"].

FN24. Some insights might be gleaned from the bankruptcy of Evans Products, *In re Evans Products, Co.*, 65 B.R. 31 (Bankr. S.D.Fla.1986). Notwithstanding the fact that it was a large, publicly-traded business, corporate raider Victor Posner was at least akin to an owner-operator. His machinations in the course of the chapter 11 proceeding raised similar problems of self-dealing and valuation. Ultimately, the creditors wrested control from him and eliminated all shareholder interests from the confirmed plan. See Bargaining, supra note 23, at 144–45.

FN25. One observer sees this exactly the other way: the interests of old equity may be insufficiently represented by the DIP, making absolute priority rules too harsh for them. Note, Bracing for the "Failure Boom": Should a Revlon Auction Duty Arise in Chapter 11?, 90 Colum.L.Rev. 2255 (1990). The assertions of injury, however, accord with neither Professors LoPucki's and Whit-

ford's empirical observations nor with a comprehensible story of chapter 11 reorganizations. See Bargaining, supra note 23, at 144.

FN26. E.g., *In re Winters,* 99 B.R. 658 (Bankr.W.D.Pa.1989).

FN27. The point might seem self-evident in the case of any sale, but the corollary point of how to develop that market is not self-evident. The following discussion of developing a market for the reorganizing business necessarily implicates a related development in the sale of business through takeovers. In the case of takeovers, the question of setting an appropriate price is also paramount, causing a number of scholars and judges to conclude that the appropriate method of determining the market price for the company is an auction. More recently, however, some scholars have questioned the circumstances under which an auction will produce the best price for the corporation. Professors Cranston and Schwartz argue that even when self-dealing management is not working to enhance the sale price of the company, auctions are likely to drive up costs and ultimately depress the value of the target business. They identify the presence of private valuation (different valuations in the hands of different bidders) and common valuation (same valuation in the hands of all bidders) of the target as relevant to the question of when an auction is useful. Auction theory is rapidly developing, and its extension to the analysis of chapter 11 reorganizations should be a fruitful avenue for further exploration. See Cranston and Schwartz, Using Auction Theory to Inform Takeover Regulation, 7 J.L., Econ. & Organization 27 (1991).

FN28. That promise is central to the justification for an attempt to reorganize. If it is not taken seriously, there is no presumption that a chapter 11 reorganization captures value that would otherwise be lost. On the other hand, creditors have the power to waive this right if they so choose, presumably on the grounds that they best understand their own interests. 11 U.S.C. § 1129(a)(7)(A)(i) (1988).

FN29. Of course, there may have been no going-concern value. The business may have been putting assets to a lower-valued use, so that the value of the firm was nothing more than the value of the individual assets. Or the assets may have no firm-specific value, such as certificates of deposit, which are valued the same regardless of who holds them. Obviously, in such a case, liquidation of the business involves no loss to the estate. In most cases, however, a going-concern valuation of assets is higher than a liquidation value. See infra note 53.

FN30. The court describes the reason that old equity proposed a $500,000 infusion of cash into the reorganizing business as based on "unique tax incentives" not present for any other investor. *In re Aztec Co.,* 107 B.R. 585 (Bankr.M.D.Tenn.1989).

FN31. Professor LoPucki cites "pride, business reputation or morality" as reasons why owner/managers offer to pay more for their businesses than they need to pay in order to retain control. LoPucki, Debtor in Control, supra note 22, at 267.

FN32. Professors Baird and Pickering have written an excellent piece analyzing the efforts of the owner/operator to receive compensation for her non-capital contribution in the context of a plan confirmation. The authors use game theory to suggest the direction negotiations might take, and they offer several insights about the bankruptcy negotiation process. Baird and Pickering, A Simple Noncooperative Bargaining Model of Corporate Reorganizations, 20 J.Legal Stud. 311 (1991).

FN33. Professor Peeples suggests that old equity holders will not abandon an enterprise both for reasons of economic rationality, such as maintaining control to keep a job in the company, and for other "unquantifiable reason[s]." Peeples, Close Corporations, supra note 2, at 84.

FN34. This is a requirement of the court-created "new value exception." See infra notes 64–73 and accompanying text.

FN35. 11 U.S.C. § 1129(a)(3) (1988).

FN36. These duties are imposed on the DIP by virtue of 11 U.S.C. § 1107(a) (1988). Failure to meet these duties subjects the DIP to replacement by a trustee or examiner under 11 U.S.C. § 1104 (1988). The Code

specifically provides that a trustee shall be appointed if the mismanagement or irregularity in management of the affairs of the debtor injures the interests of creditors, any equity security holders, or any other interests of the estate.

FN37. See, e.g., LoPucki, Debtor in Control, supra note 22, passim.

FN38. Not all equity contributions are necessarily distributed to the old creditors, but the creditors can propose a plan with that effect. If the price they offer for the business is the highest one bid, they should succeed. As a result, they have the ability to repay themselves through a plan of reorganization.

FN39. 11 U.S.C. §§ 1102, 1103 (1988).

FN40. Id. § 1121(b) (1988).

FN41. Id. § 1128(b) (1988).

FN42. Id. § 1129(a)(7) (1988).

FN43. The only variant when a DIP is buying the business over the objections of a class of creditors—the circumstances involving absolute priority—is that the question of value is now scrutinized by the court, whether a creditor raises it or not. See infra notes 75–87 and accompanying text.

FN44. 11 U.S.C. § 1129(a)(11) (1988).

FN45. Reported opinions can be fascinating to read as the court treads like a highwire walker on the line between feasibility (this company will survive and prosper) and new value (the equity in this company is not worth much because there is a good chance the company will fail). See, e.g., In re U.S. Truck Co., 47 B.R. 932 (Bankr.E.D.Mich. 1985) (the plan is feasible because the company is likely to succeed, but the company is not so likely to succeed as to make a $100,000 bid a bargain-basement price).

FN46. See, e.g., In re 222 Liberty Assocs., 108 B.R. 971 (Bankr.E.D.Pa.1990) (the creditor came up with a bid of $150,000 cash for the business). Note, however, that this issue does not encompass the question of "bidding in," a process by which the creditor bids its unsecured debt to purchase the business. Such a process clearly violates both the principles of purchase and the Code requirements. The creditor can take account of the fact that it will receive the money back on confirmation, but "bidding in" permits it to capture value without sharing an infusion of value pro rata among the other creditors. Notwithstanding its acceptance in some cases, including 222 Liberty, this process permits a differential distribution of value belonging to the estate and should be rejected. A complaining creditor is complaining because it does not want to share the necessary contribution with other creditors—precisely what the Bankruptcy Code requires.

FN47. See LoPucki, Debtor in Control, supra note 22, at 267. "There was, in fact, very little relationship between the financial condition of the debtors, as indicated in their schedules, and the amounts which they were obliged to pay creditors under confirmed plans." Id. at 268.

FN48. This view is akin to that taken by the American Law Institute ("ALI") and corporate common law on the question of management buyouts ("MBO's"). While Professors Brudney and Chirlstein would bar all MOB's, the ALI has taken the position that participation under scrutiny is appropriate. The ALI adopts a version of the auction rule, essentially precluding management from buying the company without a proper market test run by an independent committee. ALI, Principles of Corporate Governance: Analysis and Recommendations, § 5.15 (Tent.Draft No. 9) (1989) (taking a position similar to that in the Delaware courts). I am grateful to my colleague Edward Rock who has developed this analogy far more extensively than I have reported here.

FN49. 11 U.S.C. § 506 (1988).

FN50. Id. § 1129(b)(2).

FN51. Warren, Bankruptcy Policy, 54 U.Chi.L.Rev. 775 (1987).

FN52. Id. at 785–93.

FN53. Id. at 809–11.

FN54. This premise motivated Congress in developing the Bankruptcy Code. H.R.Rep No. 595, 95th Cong., 1st Sess. 220 (1977) ("The premise of a business reorganization is that assets which are used for production in

the industry for which they were designed are more valuable than those same assets sold for scrap.... It is more economically efficient to reorganize than to liquidate because it preserves jobs and assets.").

FN55. Others may continue to doubt that reorganizations should occur at all. See, e.g., Baird, supra note 6. If they continue to occur, regardless of whether or not they should, I contend that the reorganizations ought to maximize value for all the parties involved.

FN56. It is true that any number of bargaining and rationality failures can occur even when equity can cramdown. But eschewing a requirement of full creditor consent ends one source of failure to reach a reorganization.

FN57. See, e.g., E. Warren and J. Westbrook, The Law of Debtors and Creditors 474–76 (2d ed. 1991); In re Gems N' Things Inc., 60 B.R. 288 (Bankr.S.D.N.Y.1986) (appointment of a trustee is an extraordinary remedy).

FN58. Professor LoPucki's analysis of small chapter 11 reorganizations supports this conclusion. He discusses the case of Variform Plastics, Inc., in which the debtor proposed to pay 50% of the outstanding debt. Eventually the creditors offered more and a trustee was belatedly put in place. The market value rose, but LoPucki concluded that the information advantages of the debtor had not been entirely neutralized. See LoPucki, Debtor in Control, supra note 22, at 254.

FN59. E.g., Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 8219 (perm. ed. rev. vol. 1962); Lattin, Lattin on Corporations 643–44 (2d ed. 1971).

FN60. See, e.g., Covington, Basic Law of Corporations: Cases, Text and Analyses 283 (1989); Henn, Law of Corporations 648–50 (1970).

FN61. 11 U.S.C. § 1129(b)(2) (1988).

FN62. Id. § 1129(a)(7).

FN63. Id. § 1126(c).

FN64. For a thoughtful discussion of the development of this rule see Ayer, Rethinking Absolute Priority, supra note 2.

FN65. 308 U.S. 106 [60 S.Ct. 1, 84 L.Ed. 110] (1939).

FN66. 485 U.S. 197 [108 S.Ct. 963, 99 L.Ed.2d 169] (1988).

FN67. Justice White suggested in a footnote that:

The United States, as amicus curiae, urges us to reverse the Court of Appeals ruling and hold that codification of the absolute priority rule has eliminated any "exception" to that rule suggested by Los Angeles Lumber.... [O]ur decision should not be taken as any comment on the continuing vitality of the Los Angeles Lumber exception—a question which has divided the lower courts since passage of the Code in 1978. Rather, we simply conclude that even if an "infusion of money or money's worth" exception to the absolute priority rule has survived the enactment of § 1129(b), respondents' proposed contribution to the reorganization plan is inadequate to gain the benefit of this exception. Id. at 203 n. 3 [108 S.Ct. at 967 n. 3].

FN68. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990).

FN69. The Bankruptcy Court for the Western District of Pennsylvania has held that there is no "new value exception" to the absolute priority rule. *In re Winters*, 99 B.R. 658 (Bankr.W.D.Pa.1989); see *In re Drimmel*, 108 B.R. 284 (Bankr.D.Kan.1989).

FN70. 102 B.R. 560 (W.D.Tex.1989).

FN71. The far more prevalent view that the "new value exception" survives is captured in a variety of cases in which the courts sometimes decide that the "new value exception" has been met and sometimes decide that it has not, but in which they conclude that a new value exception is available. See e.g., *In re Anderson*, 913 F.2d 530 (8th Cir.1990); *In re Blankemeyer*, 861 F.2d 192 (8th Cir.1988); *In re Pullman Constr. Indus., Inc.*, 107 B.R. 909 (Bankr.N.D.Ill.1989); *In re 222 Liberty Assoc.*, 108 B.R. 971 (Bankr.E.D.Pa.1990). Pullman Construction offers a particularly careful review of the history of the absolute priority rule, concluding with a detailed anal-

ysis of the Supreme Court cases holding that unless a specific intent to change the law is manifest, it is presumed that Congress did not intend to change long-standing judicially created concepts.

FN72. 11 U.S.C. § 1123(a)(5)(D) (1988).

FN73. Bankruptcy Act of July 1, 1898, ch. 541, 30 Stat. 544.

FN74. 174 U.S. 674, 683–84 [19 S.Ct. 827, 830–31, 43 L.Ed. 1130] (1899).

FN75. *Kansas City Terminal R. Co. v. Central Union Trust Co.,* 271 U.S. 445 [46 S.Ct. 549, 70 L.Ed. 1028] (1926).

FN76. 308 U.S. at 121 [60 S.Ct. at 10].

FN77. 11 U.S.C. § 323 (1988).

FN78. See e.g., *In re U.S. Truck Co.,* 800 F.2d 581 (6th Cir.1986).

FN79. This rule seems to require that if an immediate distribution is planned, the distribution must take place through the mechanism of the court rather than by purchase and liquidation. In effect, if there is to be no capture of going-concern value, then there is no excuse for DIP participation. Not all courts list this as a requirement of the "new value exception," nor is it clear that it should be treated as one.

FN80. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351 (7th Cir.1990).

FN81. Id. at 1360.

FN82. Id. at 1362.

FN83. Id.

FN84. *In re Potter Material Serv., Inc.,* 781 F.2d 99 (7th Cir.1986).

FN85. 908 F.2d at 1362–63.

FN86. Id.

FN87. 861 F.2d 1012 (7th Cir.1988).

FN88. Id. at 1019.

FN89. Creative equity can always figure out a way to structure it right, if only form matters. See LoPucki, Strategies for Creditors in Bankruptcy Proceedings § 11.6.3 (1985). Professor LoPucki discusses *In re Landau Boat,* 8 B.R. 432, aff'd, 13 B.R. 788 (Bankr.W.D.Mo.1981), in which four directors

of the company purchased—in their individual names—equity in the reorganized company.

FN90. E.g., *In re 222 Liberty Assocs.,* 108 B.R. 971 (Bankr.E.D.Pa.1990) (old equity offered to pay $1.92 million, plan confirmation denied on other grounds); *In re Greystone III Joint Venture,* 102 B.R. 560 (Bankr. W.D.Tex.1989) (old equity offered to pay $500,000); *In re Aztec Co.,* 107 B.R. 585 (Bankr.M.D.Tenn.1989) (old equity offered to pay $500,000).

FN91. E.g., *In re Pullman Constr. Indus., Inc.,* 107 B.R. 909 (Bankr.N.D.Ill.1989) (guarantees plus 4% of outstanding debt not substantial); *In re Drimmel,* 108 B.R. 284 (Bankr.D.Kan.1989) (labor, plus offering exempt property and paying estate's attorney's fees is not substantial); *In re Snyder,* 99 B.R. 885 (Bankr.C.D.Ill.1989) (debt forgiveness not substantial); *In re Ashton,* 107 B.R. 670 (Bankr.D.N.D.1989) ($40,000 cash for $948,000 debt not substantial); *In re Lettick Typografic, Inc.,* 103 B.R. 32 (Bankr.D.Conn. 1989) (inaccurate valuations on contribution and estate prevent confirmation).